# WARNER AND WIFE v. STEAMSHIP UNCLE SAM.

An action brought by husband and wife against a steamer for breach of a contract to carry the wife to New York via Nicaragua, the alleged breach consisting in carrying the wife to Panama, and causing her detention there and consequent illness, and other injuries, though based on a contract, sounds *in tort*, and the wife is a proper and necessary party plaintiff.

Such an action is confessedly based upon the provision of the statute rendering steamers liable for breaches of contracts for the transportation of passengers or property. The contract is the substantial cause of action, and the injuries received are alleged by way of special damage. The wife is, therefore, not a proper party plaintiff, and a complaint, making her a party, is demurrable.—*Per Field, J., dissenting.*

Where the husband and wife are joined as plaintiffs, and the contract sued on and set forth in the complaint, was made between the husband only and the defendants, the name of the wife as plaintiff was mere surplusage, and not a defect of parties under the Code, and might have been stricken out on notice, if insisted.—*Per Burnett, J.*

The grant of jurisdiction to the Federal Courts in admiralty cases, is not exclusive in terms, neither is its exercise prohibited to the States, nor is its exercise by the State Courts incompatible with the harmonious working of the system established by the Federal Constitution.

It is only on the distinct ground that the appellate power of the Supreme Court of the United States extends to the State Courts in proper cases, that the concurrent *original* jurisdiction of the State and Federal Courts over *civil* admiralty cases can be sustained.—*Per Burnett, J.*

Until the question of the exclusive jurisdiction in the Federal Courts is directly passed upon by the Supreme Court of the United States, and the jurisdiction to the exclusion of all cognizance by the State Courts, is affirmed, this Court should hesitate to declare the act of the Legislature unconstitutional, and reverse the former deliberate judgment of this Court.—*Per Field, J.*

The failure of Congress to provide for an appeal from the State Courts in civil admiralty cases, can not affect the question as to their concurrent original jurisdiction under the Constitution of the United States. If this concurrent original jurisdiction exist, the right of appeal depends upon the pleasure of Congress.—*Per Burnett, J.*

APPEAL from the District Court of the Seventh Judicial District, County of Solano.

This was an action to recover damages for the mal-performance of a contract to transport Mrs. Warner and infant child from San Francisco, via San Juan del Sur, to the city of New York.

The complaint alleges a contract on the part of the agents of defendant to convey plaintiff Anne Warner, and her infant child, from San Francisco, in California, via San Juan, in Nicaragua, to New York, in consideration of certain money paid by plaintiff. That pursuant to the terms of the contract, plaintiff Anne embarked on board of defendant at San Francisco; but that defendant, instead of proceeding to San Juan, did, on account of some private quarrel of defendant's owners with the authorities of Nicaragua, proceed to the port of Panama, in New Grenada, where, by false representation, plaintiff was induced to disembark and proceed to Aspinwall for the purpose of taking passage on a steamer which the agents of defendant falsely represented

to have been at that place for the purpose of transporting the defendant's passengers to New York; that plaintiff was detained some two weeks in New Grenada by the acts of the defendant's agents, and put to great trouble and inconvenience, and suffering, by sickness, caused by the unwholesome climate.

Defendant demurred to the complaint for the reasons:

1. That the complaint did not state a cause of action.

2. That there was a misjoinder of parties plaintiff, the wife being improperly joined in the action.

3. That the Court had no jurisdiction of the subject-matter or of the defendant.

The demurrer was sustained in the Court below, and the defendant had judgment. Plaintiffs appealed.

*Jo. G. Baldwin* for Appellant.
No brief on file.

*Janes, Lake & Boyd,* for Respondent.

1. The wife was improperly joined as a party plaintiff.

" In general, the wife cannot join in an action upon a contract made during the marriage, as for her work and labor, goods sold, or money lent by her during that time; for the husband is entitled to her earnings, and they shall not survive to her, but go to the personal representatives of the husband, and she could have no property in the money lent, or the goods sold." 1 Chitty's Pleadings, 29; Thorne *v.* Dillingham, 1 Denio, 254.

To this rule there are exceptions; but this case does not fall within the exceptions.

But in all cases where the wife is a proper party the complaint must distinctly state the particular cause for making her a party, for it will not be presumed that any such cause exists. See cases cited in Thorne *v.* Dillingham, *supra.*

In this case, the consideration for the alleged promise moved from the husband, and the damages for any breach of the promise go to him.

2. No cause of action is stated in the complaint against the defendant, the steamship Uncle Sam.

As before stated, the contract declared on is a contract on the part of the owners, etc., of the Uncle Sam, to transport the plaintiff, Anne, from San Francisco to New York, *via* Nicaragua.

The action is brought under the statute providing for actions against steamers, vessels and boats. Prac. Act, ch. 6, § 317.

The clear and obvious meaning of this statute is, that a vessel shall be liable for the breach of a contract by the owners or agents *quoad* such vessel. In other words, a contract of the agent or owner, for a service to be performed by the vessel, is deemed to be the contract of the vessel, and for a failure of the

vessel to perform a service which her owners have undertaken she shall perform, the vesssl is made liable in specie.

The vessel, in effect, is hypothecated for the performance of her engagements, and a lien is given for any damages resulting from a failure of performance, enforceable by action against the vessel *in rem.*

It is not necessary to consider whether an action could be maintained against this steamer for a failure to perform a voyage to San Juan, which her owners had undertaken she should perform, for the reason that the complaint makes no such case.

Both the contract set forth, and the breaches alleged, relate to the entire passage from San Francisco to New York, and damages are claimed for a violation of the entire agreement.

To narrow the case down to an action against the Uncle Sam, for a failure to perform the voyage to which she was pledged, would be to strike out the greater portion of the complaint.

For the above reasons the judgment should be affirmed.

3. But the case presents another question of more than ordinary importance, *i. e.,* whether a State Court can entertain jurisdiction *in rem* against a foreign vessel navigating the high seas.

It is not denied by the counsel for the appellants that to maintain this jurisdiction is to decide that the State Courts may be vested with "original cognizance of civil causes of admiralty and maritime jurisdiction," and, as a consequence, that the ninth section of the Judiciary Act of 1789 is unconstitutional and void.

From the time of the passage of that act until the decision of the case of Taylor *v.* The Steamer Columbia, by our Supreme Court, 5 Cal., 268, a period of sixty-five years, the exclusive jurisdiction of the Courts of the United States in admiralty and maritime causes was never disputed by any State Court. In that case, for the first time, admiralty jurisdiction in the State Courts is broadly asserted and positively maintined.

In the opinion of the Court, by Mr. Justice Heydenfeldt, reference is made to the opinion in the case of Gordon *v.* Johnson, 4 Cal., 368, delivered by the same learned Judge, as containing the reasons, at length, upon which the decision is based, and as establishing what is termed a "point of departure," which brought the Court to the conclusion to assert a concurrent jurisdiction with the Federal Courts.

This case, if it is to be regarded as of binding authority by this Court, unquestionably does determine that State Courts may be vested with admiralty jurisdiction. But we insist that this decision ought not to be adhered to.

We admit that a solemn decision upon an important question of law by the highest Court of the State should not be lightly disturbed, and not at all, except for the clearest reasons.

The Court, in Johnson *v.* Gordon, determines that the twelfth section of the Judiciary Act of 1789, authorizing the removal of certain causes from the State Courts to the Courts of the United States, and also the twenty-fifth section, authorizing an appeal or writ of error from the highest State Courts to the Supreme Court of the United States, are unconstitutional and void. The principle there maintained was, that in all cases in which jurisdiction is vested by the Constitution in the Courts of the United States, the State Courts have an equal and concurrent jurisdiction. It is proper to observe, however, that what is said in the opinion in that case upon the right to a writ of error under the twenty-fifth section of the Judiciary Act was mere *obiter dicta.*

There was no case before the Court calling for a decision upon that question.

On the 9th of April, 1855, an act was past by nearly a unanimous vote of both branches of the Legislature, for the purpose of enforcing compliance with those sections of the Judiciary Act which the Supreme Court had declared unconstitutional, and declaring it a misdemeanor for any Judge or clerk to act in contravention of them, and subjecting the offender to impeachment. Stat. of 1855, 80.

Any weight which might be attached to the case, therefore, as a legal decision, is entirely removed by this act of the Legislature, and it ought not to be regarded as of any authority whatever, unless it is supported by a weight of reasoning the most persuasive and unanswerable.

If, then, we are permitted to go behind that case, and appeal to the authority of previously adjudged cases, it would seem that this question had been settled by a weight of great names, reasoning, and legal decisions, that can rarely be found concurring upon any question that had ever been open for controversy.

The question as to the constitutionality of the twenty-fifth section of the Judiciary Act came before the Supreme Court of the United States in 1816, in the case of Martin *v.* Hunter's Lessees, 1 Wheat., 304.

The Court of Appeals of the State of Virginia refused to obey a mandate of the Supreme Court of the United States. The judgment of the Court of Appeals rendered on the mandate was as follows :

" The Court is unanimously of opinion that the appellate power of the Supreme Court of the United States does not extend to this Court under a sound construction of the Constitution of the United States."

" That so much of the twenty-fifth section of the Act of Congress to establish the Judicial Courts of the United States as extends the appellate jurisdiction of the Supreme Court to this

Court is not in pursuance of the Constitution of the United States.

"That the writ of error in this cause was improvidently allowed under that act.

"That the proceedings thereon in the Supreme Court were *coram non judice* in relation to this Court, and that obedience to its mandate be declined by the Court."

This judgment was carried by writ of error to the Supreme Court of the United States, where the constitutionality of the act in question was fully considered and maintained without a dissenting voice.

From the time Martin v. Hunter's Lessees was decided till 1821, the question remained undisturbed, when it was again brought forward in the Supreme Court of the United States, in the case of Cohen v. State of Virginia, though in a less objectionable form than in the former case. The whole doctrine was re-examined on a motion to dismiss the writ of error, Chief Justice Marshall delivering the opinion of the Court, and the right of the Supreme Court to review the decision of a State Court was again affirmed by a unanimous judgment. Cohen v. Virginia, 6 Wheat., 264.

It would seem that these two decisions of the highest Court in the nation, made after full argument, ought to have put the question for ever at rest. And so it has been considered for thirty-five years, when the question is again mooted, and these solemn decisions overturned in the case of Johnson v. Gordon.

I do not deem it necessary to cite the numerous cases in the Supreme Court of the United States, decided subsequent to the two decisions referred to, since it is not denied that these decisions have been uniformly followed, and that a large portion of the cases constantly before that Court are brought from the State Courts, and form an important branch of its actual jurisdiction.

A case recently decided in Ohio was referred to by the appellant's counsel, in which the same doctrines are maintained as in Johnson v. Gordon.

But when it is borne in mind that that State, for several years past, has been arrayed in hostility to the federal government; that this hostility has exhibited itself in the legislative, the judicial, and the executive departments of that state; that actual resistance to federal authority on the part of the people is of common occurrence, and is sanctioned and encouraged by legislative enactment, and justified by judicial decision, it will readily be understood that the decision referred to is a part of a general system of resistance to the Constitution and laws of the United States which has already led to the verge of civil war.

But if this Court is not prepared to overrule the case of Johnson v. Gordon, still we maintain that it does not follow that the decision in the case of Taylor v. The Columbia can be supported.

45

The two cases are not at all parallel, and are not supported by the same line of argument.

The former case was the revival of an old political controversy, not in regard to the jurisdiction of the State Courts, but in relation to the independence of the State Courts.

The case of Cohen v. Virginia was argued on the part of the State of Virginia by Mr. Barbour and Mr. Smyth, than whom no more eminent names were known at the bar, and both disciples of what was termed the extreme State Rights school. It will not be pretended that they yielded to Congress or to the Federal Judiciary the right to exercise any powers which offered the least room for contest; and while much is said in their arguments in regard to concurrent jurisdiction, yet the whole contest was, to shake off the appellate authority of the Supreme Court of the United States over the State Courts, by which the State Courts were rendered inferior, and, as was urged, were consequently humiliated.

The ninth section of the Judiciary Act declares, that " the District Courts shall have exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction." Saving to suitors in all cases the right of a common law remedy where the common law is competent to give it.

The question is, whether this section of the Judiciary Act is constitutional?

The acquiescence in the constitutionality of this section of the Judiciary Act has been even more uniform and universal than that under the twelfth and twenty-fifth sections, and for the reason that there is less room for questioning it.

In the case of Martin v. Hunter's Lessees, the Court of Appeals in Virginia did not deny that the jurisdiction of the Courts of the United States was or might be made by Congress, exclusive of the State Courts. It simply denied the constitutionality of the particular mode in which jurisdiction was exercised in that case—namely, by writ of error to a State Court, which was deemed degrading to the State Court.

The argument was, and it was admitted by Judge Story not to be without force, " that the Constitution was imperative upon Congress to vest all the judicial power of the United States in the shape of original jurisdiction in the Supreme and inferior Courts created under its own authority;" and in the case of Cohen v. Virginia, one of the counsel for the State, while he did not concede in terms the proposition as broad as above stated, yet enumerated cases of admiralty and maritime jurisdiction as necessarily within the exclusive cognizance of the Federal Courts.

And Mr. Justice Johnson, in Martin v. Hunter's Lessees, (1 Wheat., 372,) says that: " The real question is, whether the State

tribunals can constitutionally exercise jurisdiction in any of the cases to which the judicial power of the United States extends."

"With regard to the admiralty and maritime jurisdiction, it would be difficult to prove that the States could resume it, if the United States should abolish the Courts vested with that jurisdiction."

These views are entitled to the more weight as emanating from a judge whose political opinions, like those of the counsel in Cohen v. Virginia, were known to be of the strict State Rights school.

In 2 Story's Commentaries on the Constitution, it is said (§ 1672) that "the admiralty jurisdiction naturally connects itself on the one hand with our diplomatic relations, and the duties to foreign nations and their subjects, and on the other hand, with the great interest of navigation and commerce, foreign and domestic; there is, then, a peculiar wisdom in giving to the national government a jurisdiction of this sort which can not be yielded, except for the general good, and which multiplies the securities for the public peace abroad, and gives to commerce and navigation the most encouraging support at home."

This exclusive jurisdiction is affirmed by the Courts of the United States in the following cases: Slocum v. Mayberry, 2 Wheat., 9; Gelston v. Hoyt, 3 Wheat., 246; The Barque Chusan, 2 Story's R., 455; Waring v. Clark, 5 Howard, 461. And a recent case in the District Court of Missouri, reported in the January number of the American Law Register, which will be presently more fully referred to.

There was no claim on the part of the appellant's counsel to uphold jurisdiction in the case at bar under the exception in the statute which gave to the suitor a common law remedy when the common law is competent to give it. The learned counsel, in his argument, as in his opinion in Taylor v. The Columbia, manifested no inclination to shrink from the responsibility of directly assailing the validity of the Judiciary Act, and asserting a broad admiralty jurisdiction.

It is proper, however, to consider what that common law remedy is which is saved, not given, and whether it embraces this case?

At the time of the adoption of the Constitution and the passage of the Judiciary Act, the admiralty jurisdiction was not clearly defined, and there was much conflict of opinion concerning its extent. There was a class of cases in which the admiralty in England sometimes claimed and exercised jurisdiction in *personam*, in which an action of trespass, case, or *assumpsit*, was maintainable at common law. And the Common Law Courts frequently interfered by writ of prohibition, to restrain the Courts of Admiralty from taking cognizance of such cases.

This controversy has been revived in this country, and per-

haps can not be yet be regarded as entirely settled, although it has been determined that Courts of Admiralty are not confined to the narrow limits to which they were restricted in England by the jealousy of the Common Law Courts. De Lovio v. Boit, 2 Gallison, 470.

Congress, in framing the Judiciary Act, while it did not attempt to define the extent or limits of admiralty jurisdiction—leaving that question for the decision of the Courts under the general principles of maritime law—was careful to leave in the Common Law Courts all the jurisdiction that they had theretofore exercised.

To this no reasonable objection could be foreseen, since from the organization and construction of the Common Law Courts as Common Law Courts, it was not possible for them to extend their jurisdiction to cases which had been theretofore within the acknowledged exclusive jurisdiction of Courts of Admiralty in England. Hence the Common Law Courts, by the exception in the ninth section of the Judiciary Act, retain the same common law jurisdiction over the class of cases above referred to, which they possessed at the time the Constitution was adopted. 1 Kent Com., p. 377, note.

But the causes of admiralty and maritime jurisdiction which had theretofore never been entertained by the Courts of Common Law, but had been taken cognizance of exclusively by the Courts of Admiralty, were committed exclusively to the Federal Courts; and the constitutionality of this exclusive jurisdiction was not questioned even by Mr. Justice Johnson, in an opinion in which he exhibits no little jealousy of the jurisdiction of Courts of Admiralty. He says: " I think it high time to check this silent and stealing progress of the admiralty in acquiring jurisdiction to which it has no pretensions." Ramsey v. Allegre, 12 Wheat., 611.

It must be borne in mind that the question in this case is not, however, whether the Courts of Admiralty have grasped at too much jurisdiction, but whether a Court of Common Law can assume new jurisdiction heretofore only entertained in the admiralty.

On this point of a common law remedy we are saved much labor by the very elaborate examination of the question in the case of Ashbrook v. The Golden Gate, by the Judge of the U. S. District Court for the District of Missouri, above cited. Jan. T., Am. L. Reg., 148.

In the case at bar, the steamer Uncle Sam is confessedly a vessel navigating the high seas, and owned out of this State, and hence a foreign vessel.

She is proceeded against in rem, not by common law action, but under a statute which purports to give this special remedy, unknown to the common law. Any judgment that may be re-

covered is intended to operate directly on the vessel. She must be sold to satisfy it.

The appellant's counsel was quite right in conceding that it was, to all intents and purposes, an admiralty proceeding. So the case of Averill v. The Steamer Hartford, decides, (2 Cal. R., 308,) and so the case of Taylor v. The Columbia reiterates. He contends that all this follows the first " departure," in Johnson v. Gordon.

The " departure" declared the twelfth and twenty-fifth sections of the Judiciary Act unconstitutional. The second departure, Averill v. The Steamer Hartford, *supra,* vested the State Courts with admiralty jurisdiction *pro tanto;* and the third " departure" declares the ninth section of the Judiciary Act also unconstitutional, and vests the State Courts with full admiralty jurisdiction, not *pro tanto,* but *in toto.*

What is to be the effect of holding to this jurisdiction? However important the questions involved in Hunter v. Martin's Lessees, and Cohen v. Virginia, it has fortunately happened that very little practical evil has resulted, or is likely to result, from them. But on this question of conflict concerning admiralty jurisdiction, the mischievous consequences are immediate and inevitable.

In attempting to seize vessels under State and Federal process, collisions must frequently occur between marshals, sheriffs and constables. Where is the conflict to end? Neither Court could claim a victory in such a contest, where the inevitable consequences must be to degrade both.

It is not too late to retire from a controversy which we submit was most needlessly commenced, and return to the " point of departure."

Whatever doubts were once supposed to exist as to the wisdom of entrusting to the Supreme Court of the United States the interpretation of the Constitution and the construction of laws passed under it, the experience of sixty-seven years has served to dispel them. The wisdom, learning, integrity, independence, and firmness which has so eminently characterized that bench, have won for the Court the confidence of the whole nation.

In times of the highest political excitement, the people look to it as the only hope of safety, and private opinion is ever ready to yield to its judicial determinations.

The continuance of its usefulness must mainly depend upon the respect with which its decisions are received by the State Courts.

*Jo. G. Baldwin* in reply to Respondent's argument.

I differ from the learned counsel upon two points : 1. The construction of the act. 2. The matter of exclusive jurisdiction

of the Federal Courts, and, therefore, of the constitutionality of the State law.

The counsel think it clear that the vessel, under this law, can only be answerable for the part of the contract to be performed by the vessel, for this is the plain English of the proposition. But this, we submit, can not be; for that would be to say the vessel, in such a case as this, could not be made responsible at all, since a contract is an entire thing, not divisible or capable of being divided. There can be no enforcement of a portion of a contract. The vessel must be bound for the whole contract, or none. It is true that the vessel was not to complete the whole transportation of the passengers. But the agents undertook to transport them by means of this vessel and others; the vessels were the mere vehicles by which the contract was to be performed; and each of these vessels is responsible for this duty. This answers as well the necessities of the case as the language of the law: " All vessels shall be liable for non-performance or mal-performance of any contract for the transportation of persons or property made by their respective owners, masters, agents, or consignees."

These words certainly do not limit the responsibility of a vessel doing the entire work of transportation when it is considered that the greater portion of contracts of this sort was made by steamers plying between San Francisco and the Central American ports, no one vessel performing more than a part of the service of transportation to the Atlantic ports. This construction may readily be presumed to have been within the view of the Legislature. Nor is there anything unreasonable in this; especially when the vessel sought to be made liable belongs to the same company that made the contract. The company is unquestionably responsible for the violation of the contract; and I know of no rule which forbids a plaintiff, if the Legislature chooses so to direct, from serving process on the servant or agent of a company, or attaching its property, to answer for a violation of its contracts, any more than by proceeding against it to judgment, by publication.

I shall as briefly as possible proceed to argue the question of jurisdiction. It is admitted that this very question has been heretofore decided by the Supreme Court.

That decision is assailed. Since that decision, many cases have been brought in the State Courts, and rights vested under them; and so the evils of disturbing rights which the doctrine of *stare decisis* deprecates are involved in the reversal. Besides, the jurisdiction of the State Courts over these matters is, particularly at this time, very important; the delay and expenses of the Federal Courts, especially when great monopolies are concerned, able to carry cases to the Supreme Court of the United States, make litigation in those forums almost a denial of justice. It

seems to me, therefore, that this Court would at least wait for an authoritative decision of the Supreme Court of the United States before it declared the act of the State Legislature unconstitutional, and reversed its own decision upon so important a matter to its citizens.   Even were there a clearer exposition of the soundness of the counsel's propositions than appears.

In the first place, it may be remarked that the contract of transportation made by the company might be enforced at the common law, for all we can see, like any other contract of a common carrier.   We do not see, nor is it contended to the contrary, that the company might not have been sued *ex directo* in the Courts of California for a violation of its contract to convey freight or passengers, the contract being made in this State.   The general power exists in the State Legislatures—authority to prescribe the remedy for contracts; nor is it easy, within certain obvious restrictions, to impose limits on this power.   It is not perceived why a contractor shall be by name made defendant, if he is authorized to come in to defend, and has notice to defend—the law fixing what that notice shall be. If the action of replevin were an action by the owner or deplisa against the thing deferced. with notice to the deficar, or his his bailee, it is not seen why this would not be as good a suit at law as any other.   True, there must be parties, but those parties may be made indirectly as well as directly, in one form or another —at one time as well as another.   The mere title of the suit is nothing; the real controversy is a suit between persons waiving their claims to property or money; nor is the fact that the Legislature adopts the forms of Courts of Admiralty important. It may mould the proceedings to suit itself after any old system of practice, or make a new one.   Attachments are held to be proceedings *in rem,* to sales of estates of decedents and for forfeitures, etc.   And these partake in some degree of the admiralty system.   Nor does the fact that a lien is given on the property, invalidate the law or the proceedings.   The Legislature may make a suit a lien if it chooses, as it does in some State cases, just as well as a judgment.   If, therefore, the State has jurisdiction, legislative and judicial, over contracts and remedies, and these relate to a contract to be performed on the water or elsewhere, as well as here, or partly performed here and partly elsewhere; and if they may mould these remedies to suit themselves, it follows that a law authorizing a vessel to be sued on notice to the owner or his bailee, will be within the competency of the Legislature.   The right of a State to create a lien on vessels has not, we believe, been denied; the right has been often exercised; the question has been whether the United States Courts would enforce the lien beyond the State jurisdiction.

We understand the learned counsel to contend that the claim is within the admiralty jurisdiction of the United States, there-

fore, that jurisdiction is exclusive. This we deny; the second article of the Constitution provides that the judicial power shall extend to all cases of admiralty and maritime jurisdiction; also, between a State and citizens of another State; between citizens of different States; between citizens of the same State, claiming lands under grants of different States; and between a State, or the citizens thereof, and foreign States, citizens, or subject.

And yet, in every one of these cases, without exception, the jurisdiction of the United States Courts has been held not to exclude that of the State Courts, with the single exception of the admiralty and maritime jurisdiction, if that be an exception. How is this? How does it happen that the same words, applied to one class of cases, do not apply to another? It will not do to say that the United States permits the State to entertain jurisdiction in these other cases, for, if the Constitution excludes it, Congress could not permit it. Indeed, the act of 1789, authorizing the removal of cases from the State Courts, implies the jurisdiction of the State Courts, with a mere right to have a trial in the Federal Court; for, if the State Court had no jurisdiction, its proceedings would be void, but, so far as they go, they are held valid. We say, therefore, that if the act of Congress be, as it ought to be, construed by the counsel, it is unconstitutional in this: that it gives an exclusive jurisdiction to the Federal Courts, of that which is equally within the cognizance of the State Courts. But, is it to be construed so? When the act in the ninth section speaks of the exclusive original jurisdiction of the District Courts, does the word "exclusive" refer to other Courts of the United States, or does it refer to the State Courts? Is it not a mere term of definition of the powers of the different Courts of the United States? But, if we are wrong as to this, then we say this case is within the saving of the act of 1789.

That act saves from the "exclusive operation of the act," in all cases, the right of a common law remedy, when the common law is competent to give it. The origin of and the necessity for this proviso, are well explained in the case of Cashmen v. De Woolf, in 2 Sandford Sup. C. R., 388. The Court say: "The Constitution authorizes Congress to create inferior Courts, and confer on them admiralty jurisdiction. Until Congress exercised the authority, there was no interference with the State Courts, and where the United States District Courts were created, and their cognizance defined, their jurisdiction became exclusive only so far as it was made exclusive by the act of Congress. In all other cases where the Courts of Common Law provided an adequate remedy before, it seems to be plain that the Judiciary Act at most gave only a concurrent remedy to the admiralty.

Now, it is perfectly clear that the common law in this case did

Warner v. Uncle Sam.

provide an adequate remedy before suit might have been brought upon the contract of transportation.

Therefore, the jurisdiction over the subject was not taken away from the State Courts. They had it before; they have it now. This is all we want. As to the mode in which the State Courts shall exercise their jurisdiction, as we argued before, this is wholly unimportant. We are discussing a question of jurisdiction, not a question of practice.

The Constitution and the acts of Congress deal with things, not forms. The object, evidently, was to give to the Courts of the United States only such exclusive jurisdiction, of admiralty or maritime matters, as was denied by the English to the Common Law Courts. When the Common Law Courts had jurisdiction before, they were to retain it. They had jurisdiction before of just such cases as this. The case in 2 Sandford was an equity case, a case of salvage, too, not a case having a common law remedy at all, but it fell within the principle just announced. The word "remedy" is not to be taken as Judge Lake supposes, in its technical sense, as contradistinguished from right. It means merely a legal cause of action, for it would be absurd to suppose that Congress intended to make jurisdiction dependent upon a mere process of practice; if so, Louisiana could never have obtained the benefit of it at all, as she had no common law remedies. The sense of the thing is simply this: when, at common law, an action laid there, admiralty questions were concurrent in the United States and the Common Law Courts; when it did not lie, the jurisdiction, (as in prize cases,) was exclusive in the Admiralty Courts, then the Admiralty or United States Courts had exclusive jurisdiction.

The Court is invited particularly to examine the case in Sandford, and the argument of D. Lord, in illustration of this view of the subject. See, also, 16 Johns., 328; 18 Johns., 291; 6 How., 389; 15 Irvin, 173; 1 Baldwin, C. C., 544; Gilpin, 191; 10 Wheat., 428; 2 Gall., 307; 2 Story, 455; Ware, 91.

If this principle be established, it follows conclusively that this State has a right to its jurisdiction over this subject; that this being so, it could have exercised it by proceeding *in rem* or *personam*, in admiralty form, or civil law form, or any other form it chose; it was a common law right, and the mere process of working out that right is wholly unimportant, so far as the question of jurisdiction is concerned.

I have seen no case which maintains the exclusive jurisdiction of the United States Courts. Those cited by the respondent do not, according to my reading of them.

The contest among the Federal Judges seems to have been not as to the exclusive jurisdiction of the United States Courts in admiralty cases, but as to the fact of that jurisdiction in particular cases. Story and Wayne, taking extreme federal ground,

and Baldwin, Daniel, Woodbury, and others, opposing, this contest seems to be still going on.   See, 17 and 18 Howard, or refer the Court to the able and learned opinion of Judge Woodbury, in 6 Howard.   The feeling has been general in the State Courts, and with the ablest members of the Supreme bench of the United States, that the Federal Courts have stretched the jurisdiction in admiralty to the point of usurpation; and we do not think this Court will be disposed to carry it further than they have gone.   2 Wheat., 3 H., 2 Story, 5 Howard, it is submitted, do not establish the doctrine of exclusive jurisdiction.

The decision of the District Judge of Mississippi is no authority, and is opposed by the case in 2 Sandford.   The reasoning is too narrow and technical.

It is submitted that, as an original question, the doctrine of Gordon *v.* Johnson is correct, that to "extend jurisdiction" to the Federal Courts is not to exclude a pre-existing jurisdiction; that, therefore, the latter jurisdiction is concurrent with the former; that it is a rule of concurrent jurisdiction; that the forums of each are equal in power, and this is the rule of sovereignty. Hence, the Courts of the United States could not take jurisdiction away from the State Courts.   In a particular class of cases it has been held that the doctrine is not sound, but it has not been so held by the Supreme Court of the United States in this class of cases.   Even if this Court holds itself bound by the decisions of the Supreme Court, so far as they have gone, it does not follow that it will go any further.   If they follow the Supreme Court, it is because of the authority—not of conviction, if this Court agrees with us in this respect.

But we think, independently of this view, that the law of the State Legislature is constitutional, because, mainly, the right to sue was a common law right, and the act a mere change of remedy, which it was always competent for the Legislature to make. To hold otherwise would be to hold that every change, or any change of remedy, ousted jurisdiction.

BURNETT, J.—The first ground of demurrer was that the Court had no jurisdiction, for the reason that the defendant was a foreign vessel, engaged in navigating the high seas, and not liable to be sued in a State Court.   In the case of Taylor *v.* The Steamer Columbia, (5 Cal. Rep., 268,) this Court decided that the judicial power of the Courts of the United States, in admiralty and maritime causes, was not exclusive; that the States have the power to confer upon their Courts all admiralty and maritime jurisdiction, and that Congress has no power to make this jurisdiction *exclusive* in the Federal Courts.   The decision in that case referred to, and relied upon, the opinion in the case of Johnson *v.* Gordon, (4 Cal. Rep., 368.)

The learned counsel for the defendant asks us to review these

decisions, heretofore rendered by learned judges who are not now members of this Court. In making this request, he concedes that " a solemn decision, upon an important question of law, by the highest Court of the State, should not be lightly disturbed, and not at all, except for the clearest reasons." That distinguished commentator on American law, Chancellor Kent, has said :

" It is probable that the records of many of the Courts in this country are replete with hasty and crude decisions, and such cases ought to be examined without fear, and revised without reluctance, rather than to have the character of our law impaired, and the beauty and harmony of the system destroyed by the perpetuity of error."

But it can not, with any reason or justice, be said that the decisions in the two cases of Johnson *v.* Gordon, and Taylor *v.* The Columbia, were either crude or hasty. That they were well and solemnly considered, is apparent from the opinions delivered, and the nature of the questions determined. We, therefore, undertake this duty with a full sense of the great responsibility imposed upon us, and with a due respect for the opinions of the learned jurists who formerly filled this bench.

The first question arising in this case is this : What tribunal, if any, in the contemplation of our system, has the right to construe the Constitution and laws of the Union, in the *last resort ?*

The ratification of the Constitution of the United States was the act of each State, acting for itself, as a sovereign and independent body. The Constitution was not adopted by the people of the United States, as individuals composing one entire nation, but as composing distinct and independent communities; each individual belonging to only one of these independent sovereignties. Each State had the *exclusive* right to ratify or reject, without any regard to the extent of its territory, or the number of its population. Each State acted as an independent equal, and as a distinct unit. For this reason the Constitution might have been rejected by a majority of the whole people.

But is the fact that the Constitution was *thus* ratified by sovereign States, each acting separately and independently of all the others, any evidence of the character of the government *thus* formed ?

It would seem to be true, that although the States acted in this manner in ratifying the Constitution, they still had the right to give to the Government they created such form and character as they pleased. They could have made it a national or federal government; or a government of mixed character. We will suppose, for the sake of the argument only, that they intended to constitute a strictly national goverment. Being sovereign States, already in existence, and intending to merge their

entire powers in one national government, they could only do this in one of two modes; either by adopting the method of ratification by States, or by dissolving themselves into their original elements, and thus permitting the people, as members of but one political community, to form their own Constitution.

If we are correct in these views, it follows that the *manner* in which the Constitution was ratified by the States is no evidence as to the character of the government in fact created by the Constitution; and we must look to the instrument itself, and learn from its language the nature of the powers conferred, and the ends contemplated by the system, to ascertain where that judicial sovereignty is placed—the right to decide in the last resort. As the States had the right to cede their entire powers to the government they created, they had the right to cede a part; and if a part, then they had the right to cede to the new government the highest attributes of sovereignty, the exclusive right to determine its own powers under the Constitution. And it may be that there existed the most ample reasons for giving this power to the federal government, as it must, of necessity, be placed somewhere.

The ends contemplated by the framers of the Constitution, as stated by the instrument itself, were these : To form a more perfect Union, establish justice, insure domestic tranquility, provide for the common defence, promote the general welfare, and secure the blessings of liberty to the American people and their posterity.

It would seem, therefore, to be true, that the federal government was intended to reach and act directly upon the *individual* citizen. For this reason, it is in truth a government, and not a mere confederation. The great and radical defect in the old confederation was, that it acted upon artificial and not upon natural persons. In the theory of our American systems, laws are made, interpreted, and executed, by the whole people acting as an entirety, but are generally executed upon individuals, in their capacity as such. For when laws are enacted, interpreted, and executed, by the proper *organs* of the people, they are made, interpreted, and executed as the act of the whole, although these *organs* are only chosen or appointed by a portion. Where the powers of government are exerted upon separate individuals, their operation, from the very nature of the case, is much more easy, practical, and efficient, than when they are operative only upon large and combined masses of men.

It is true, that in some respects, the powers of the federal government are exerted over the States as such; as, for example, where a controversy exists between two or more States. For this and other reasons the federal government is, in the language of Mr. Madison, " of a mixed character." (Federalist, No. 39.)

It would also seem clear that the Federal and State governments must constitute but *parts of one entire* system; and, if parts of an entire system, it must have been intended that they should operate harmoniously, without any essential discord. This must have been so from the fact that the same people and territory were to be governed by both. As both governments were to operate peacefully, and yet efficiently, upon the same individuals within the same territory, it must have been intended to give the system some logical consistency. And whatever theory was adopted was intended to be practical, as well as beneficial, in its *actual* results. Governments can only be intended for practical purposes. There could be no other end contemplated by the founders of any government. The influence and power of government must be felt in the daily affairs of life.

As all the powers of government were intended, by the framers of the Constitution, to be divided between the Federal and State governments, it was necessarily their duty to mark the line of separation between the two, as plainly and distinctly as possible. But, as Mr. Justice Johnson so well remarks in his opinion in the case of Martin *v.* Hunter's Lessee, 1 Wheaton, 374, "language is essentially defective in precision." This being the true *general* character of language, the framers of the instrument were compelled to convey their intentions through a defective medium. And not only so, but they were compelled to provide, in *advance,* for all future cases. This they could only do by laying down *principles.* The Constitution, from its nature as a concise and fundamental law, could only deal in general principles, expressed in general terms. It was impossible to anticipate all the future contingencies which might, or might not happen, and to make minute and exact provisions for each possible case.

From the very nature of the case, the wise statesmen who framed the instrument must have anticipated that the most difficult questions would arise, as to the true nature and extent of the powers conferred upon the federal government; and, by consequence, of those reserved to the States. Not only were the powers of the federal government limited, but those of the States were also limited; and the powers of both, taken together, were still limited; so that questions of grave difficulty must have been foreseen, not only as regarded the proper distribution of powers between the two different systems, but also as regards the limits of the powers granted to each, and to both.

The invincible necessity, therefore, of some tribunal to settle, *peacefully and finally,* these difficult questions would seem to be apparent. And it would seem equally clear, that this power of deciding in the last resort, must, of necessity, be placed in the highest tribunal, either of the federal government, or of each State, and could not be confided to *both.* We could as readily

conceive of two or more Supreme Deities governing the same universe, as of two or more Supreme Courts construing the same code of law for the same people. There could be no unity, peace, or practical efficiency in such a system, if it could properly be called a system at all. It would leave the Federal and State governments always in conflict, with no power to determine the questions between them. It would be "without form and void," and "darkness" would be "upon the face" thereof.

In which government does this power reside? Is it confided to the Supreme Court of the United States for the whole Union? or to the Supreme Court of each State for the benefit of each State?

In the case of Cohens v. The State of Virginia, 6 Wheaton, 381, Chief Justice Marshall said: "The general government, though limited as to its objects, is supreme with respect to those objects. This principal is a part of the Constitution; and if there be any who deny its necessity, none can deny its authority."

That the powers of the federal government, though limited, must be supreme within the limits prescribed, is not only evident from the general nature of the powers themselves, but from the extent of their operation, and also from the express provision of the Constitution itself, that "this Constitution, and the laws of the United States, which shall be made, in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the Judges in every State shall be bound thereby; anything in the Constitution or laws of any State to the contrary notwithstanding."

It must, we think, be conceded that this "supreme law of the land" was intended to be supreme *as construed and applied* by the proper tribunal. In other words, it was not to be supreme *solely* in its dead letter, but in its practical construction. Its supremacy was not to be alone admitted in name, but in fact. For this reason, the Constitution provided that "the judicial power of the United States shall be vested in one Supreme Court, and in such inferior Courts as the Congress may, from time to time, ordain and establish."

There is but one Court created by the Constitution itself; but that Court is made supreme. The Constitution then defines the limits and extent of the judicial power itself: "The judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made under their authority," etc.

In reference to the *extent* of the judicial power, Chancellor Kent has said: "The judicial power in every Government must be co-extensive with the power of legislation. Were there no power to interpret, pronounce, and execute the law, the Gov-

ernment would either perish through its own imbecility, as was the case with the old Confederation, or other powers must be assumed by the legislative body, to the destruction of liberty." 1 Kent, 296.

The Supreme Court has both original and appellate jurisdiction. Its original jurisdiction depends upon the character of the parties, and not upon the subject-matter of the controversy; while its appellate power extends to all the other cases mentioned, including "all cases in law and equity, arising under" the Constitution, treaties, and laws of the Union. The power of the federal judiciary is not only co-extensive with the legislative, but goes beyond it, and embraces all cases affecting certain *parties,* whether the controversy arise under a law of the Union, or under a law of a State. It is therefore evident, from the character and the extent of the judicial power given, that great confidence must have been reposed in the Supreme Court of the United States by the framers of the instrument.

As the laws of the federal government are made by the Constitution the *supreme law of the land,* and as the judicial power of the same government extends to *all cases,* in law and equity, arising under *this law,* and as no right of appeal is given, it would seem to follow, as a necessary logical result, that the determination of the highest tribunal created by this *supreme* law, must be final and conclusive upon all. The government, whose law is supreme over all, must provide its *own* tribunal to construe its own law in the last resort. If the law be supreme, the highest tribunal created by that law must be also supreme. If the law be supreme over the Constitutions and laws of the States, then it would seem a necessary result that the interpretation of this law by the highest tribunal created by the law itself, must be equally supreme over the Constitutions and laws of the States. The government in which the supreme law is found, must, of necessity, possess the highest attribute of sovereignty—the exclusive right to determine its own powers under the Constitution, Without this power, it is difficult to conceive how such a government could properly be called supreme. To say that the law of the Union shall be supreme—that the jurisdiction of the federal judiciary shall embrace *all* cases, in law and equity, arising under it; and yet to say that the decision of such questions is not conclusive in the contemplation of such a theory, is to say that which would seem to be contradictory, inconsistent, and, therefore, untrue.

If we are correct in the position that the supreme law was intended to be such, when construed by the proper tribunal, then it would seem to follow that this construction was intended to be uniform—that the same law, as actually *construed and administered,* should be the same in every part of "the land" over which it assumed to be the supreme law. That this end was contem-

plated by the framers of the Constitution, seems not only to flow from the nature and reason of the case, but from the organization of *one Supreme Court*. It seems difficult to conceive of any other adequate motive for the creation of this tribunal. To carry out this intent, the appellate power of the Supreme Court is made to embrace all the cases specified. This appellate power is not confined to the decisions of any specified inferior Courts, but is general, and only limited to the *cases* mentioned. The Congress has full power to establish *inferior* Courts, but only inferior Courts. And though the judicial power is vested in the Supreme Court, and in such inferior Courts as Congress may establish, it does not follow, from this fact, that the appellate power of the Supreme Court is thereby confined alone to those inferior tribunals. For if this were true, the very end and object of the Constitution in establishing this one Supreme Court would be substantially defeated. It would leave each State tribunal to determine conclusively its own jurisdiction, and to make a final construction of the law of the entire nation. And the language of the Constitution, that this *appellate* power shall extend to all *the cases* mentioned, could not be true. When the appellate power is extended to *all cases*, in law and equity, arising under specified laws, it must, from the very nature of appellate power, be supreme over all such cases, whether they arise in a State or Federal Court. The power is given over the *case* wherever pending.

But if we take the theory that the Supreme Court of each State has the right to construe the Constitution and laws of the Union, in the last resort, to be true, for the sake of the argument, it would seem to defeat, substantially, all the ends contemplated by the Federal Constitution. It was certainly supposed, by the framers of the Constitution, that the powers of the federal government were of paramount importance; and that the ends to be accomplished by their exercise were necessary to national and individual happiness. How these powers could have the same uniform and beneficial operation over the entire Union, when the instrument conferring them, the treaties made, and the laws passed under it, must be subjected to the final, and yet conflicting, interpretations of an indefinite number of supreme State tribunals, it is difficult to conceive. Here is a law declared by the Constitution itself to be supreme over a given territory; yet, if this theory be true, it was originally subjected to the independent interpretation of thirteen, and now of thirty-one, Supreme Courts, each giving a final conclusive decision within the limits of its own territory. This government, assuming to be supreme over the entire nation, and with laws declared to be so, is allowed only that power in each State which the Supreme Court thereof may permit. In the contemplation of this theory, the federal government is only supreme in name and

pretension, but not so in truth and fact.   It has the shadow, but not the substance of supremacy—the form, without the power. It is the servant of many independent masters, with different wills and dispositions.   And if it be true, as insisted by the learned Judge who delivered the opinion of this Court in the case of Johnson v. Gordon, that uniformity of opinion "is incompatible with the known characteristics of the human intellect," it would seem to constitute the most evident and forcible reason for rejecting the theory that submits the same law, intended to be equally supreme everywhere throughout the entire Union, to the construction of so many different supreme tribunals. And, therefore, if uniformity of decision be substantially attainable at all, it can only be had under the decisions of *one* Supreme Court.

If this theory be true, it would be the duty of this Court to prevent the exercise within this State, by the federal tribunals, of all jurisdiction, which we, in our opinion, might judge to be unauthorized by the Constitution of the United States.   And, as neither the Constitution of the United States, nor the laws of this State, provide any mode for taking an appeal from the federal tribunals to this Court, the only way in which we could enforce our decisions would be to restrain the parties, or the officers who were sent to execute the judgment.   If the right belongs to us, and not to the Supreme Court of the United States, to construe the laws of the nation, in the last resort, then a decision by that tribunal, in a case where we should think it had no jurisdiction, would be void, and could not be enforced in this State by any federal officer.   And it would be very questionable, under this theory, whether a decision, based upon a construction of an act of Congress, which we might think unconstitutional, would be binding and conclusive upon the parties.   As no mode of direct appeal is provided, and no time specified within which it must be taken, there could be no negligence on the part of the party against whom the judgment was given, and for this reason he might be allowed to resist the enforcement of the judgment itself.

The practical result of this theory would seem to render the general government wholly incompetent to accomplish the great ends intended and to make it as feeble and imbecile as the old confederation.   For, while the federal government would be ostensibly allowed to act directly upon individuals, its action would be subjected to the restriction of thirty-one Supreme Courts, whose duty it would be to protect these same individuals from that which each of these Supreme Courts should determine to be the usurpation of the federal judiciary.   If the supreme right to determine the construction of the Constitution and laws of the Union in the last resort, resides in the Supreme Court of each State, then this right must be efficiently exerted in all proper

46

cases in *some form*.   It would be idle to possess the power and not to use it when required.

There can be but little essential difference, *in principle*, between confining the action of the federal government solely to *artificial* persons, and permitting this action to extend to *natural* persons, while at the same time these artificial persons have the right to restrain such action, when, in the opinion of their agents, it should be done.   The difference in the two cases is only the difference between action and non-action.   But the power to defeat the action of the federal government is the same in both cases.   In one case it requires action to accomplish the end, while in the other, it is done without action.   "The requisitions of Congress," says Chief Justice Marshall, (6 Whea., 388,) "under the confederation, were as constitutionally obligatory as the laws enacted by the present Congress.   That they were habitually disregarded, is a fact of universal notoriety."

It is most cheerfully conceded as true, that under no theory can entire continued practical uniformity of decision be attained. This is owing to an inherent infirmity in all human institutions, and arises from two main causes :

1.  That the appellate tribunal can only act when parties choose to take a case up before it.   From this cause, a want of *temporary* uniformity may be found, but the means of obtaining *ultimate* uniformity always exist.

2.  The same appellate tribunal may overrule its own decisions, in some cases.

But although entire uniformity can not be attained, substantial uniformity is the end sought, and this can be reached.   The main object of organizing the Supreme Court of this State, was to produce this substantial uniformity of decision.   True, we occasionally overrule some of our former decisions, but still the great mass remains untouched.   The same object was intended to be accomplished by the organization of one Supreme Court of the United States.

And there would seem to be a great difference between substantial uniformity and substantial confusion.   Suppose no one Supreme Court had been created by the Constitution of this State, and each District Court had been allowed to make a final decision, what would have been the inevitable result? If we take all the different constructions of the Constitution and laws of the Union, to be found in the records of the Supreme Courts of the different States, from the organization of the federal government to this time, the state of confusion and conflict will be apparent.   And it must be conceded, that this confusion and conflict would have been much greater, had the State Supreme Courts proceeded from the beginning, upon the ground that they had the right to interpret in the last resort. But as they have generally followed the decisions of the Supreme

Court of the United States, much of this confusion has been avoided. And if we examine the decisions of that august tribunal, we shall find very few substantial discrepancies. Few former decisions have been overruled; and the system of Federal and State governments, as shown by these decisions, is logical, practical, and beautiful in every feature. And conceding that no absolute uniformity be attainable, it is not perceived why we should not approach as near to it as may be. Human efforts are never more than substantially successful. The criminal laws of a State never can entirely suppress crime; but this constitutes no good reason for abolishing them. There is an almost immeasurable distance between the best and the worst man; and yet the best is not perfect. And because an individual can not be free from *all* faults, is it any reason why he should not use every proper means to correct those he has?

It may be, as it has been urged against the right of the Supreme Court of the United States to be the final interpreter, that "the concurrence of this department with the others in usurped powers might subvert for ever and beyond the possible reach of any rightful remedy, the very Constitution which all were instituted to preserve." Mr. Madison's Virginia Report, January, 1800, cited 1 Story on the Constitution, 259.

The entire problem of government has always been found one of great difficulty, notwithstanding the long and continued experience of mankind. In reference to many points, there is ample room left for differences of opinion; and that, too, among men of the most acute and generous minds. But though investigation and time may not have settled all doubts, in reference to every point, there would seem to be, at least, some positions substantially established by common sense and common experience. Among the positions that would seem to be settled, are these: that a certain measure of power is invincibly necessary, and must be bestowed upon government; and when bestowed, must be placed somewhere; and all that can be done, is to give the power with proper checks and balances to prevent abuses. Government can not exist at all without power; and wherever power exists, it may be abused. And after all that has been, or can be said, it comes at last to this: that we must, of necessity, choose one of two things—either the non-existence of government, or the chance of abuse. It may also be assumed as true, that under no possible system, can the powers of government be so guarded as entirely to remove the opportunity of abuse. This we must anticipate to a certain extent.

The theory of the Constitution of no government ever contemplates revolution. It is, however, true, that they all assume to be perpetual; and where a Constitution provides no mode for its own amendment, the right of revolution is the only remedy. Our Constitutions, both National and State, provide a mode of

amendment ; and this right of constitutional and peaceful amendment, is the proper remedy against abuses, when other peaceful remedies fail.   The Judges of the Supreme Court of the United States are appointed by the President of the United States, by and with the advice and consent of the Senate.   The President himself is elected every four years, not in form, but practically by the people themselves.   It is true, he may be at times elected by a minority of the whole people, but this can not be the general result.   From the number of the Judges, and the manner of their appointment, they must, as a general rule, be men of the first character for ability and integrity, and taken from different sections of the Union.   Under these circumstances, it would seem the power of final interpretation is most safely and properly lodged in that tribunal.   For if we take the other hypothesis to be true, that this power resides in the Supreme Court of each State, there it is equally, if not more, liable to abuse ; and the result of this abuse must lead to equal individual oppression, and much greater national confusion.

Every consideration would seem to lead us to the conclusion that the framers of the Constitution reposed this power of final interpretation in the Supreme Court of the United States.   We can well conceive of a division of powers between the State and Federal governments.   But we can not conceive of an equal division of strict sovereignty between the two systems.   Sovereignty is a unit that can not, in its very nature, be divided.   It must reside with only one party ; and the highest ultimate right to determine the limits and powers of each, must belong to that government with which is found the supreme law of the entire nation.

That the utmost confidence was reposed by the framers of the Constitution in the Supreme Court of the United States is apparent, not only because its appellate power was extended to all cases, in law and equity, arising under the laws of the nation, but because of the original jurisdiction vested in this Court in reference to controversies existing " between two or more States."   In these cases, one or more States are required to appear before this Court at the suit of one or more of the other States.   They appear *as parties* before a Court whose decision is final and conclusive upon them.   In these cases, the Court does not act in the mere capacity of a mediator, or as a friendly adviser.   Neither party has a right, in the contemplation of the Constitution, to reject the decision upon the ground that the Court has usurped jurisdiction, or erred in any other way, in rendering the judgment.   But the Court gives its decision with the same final and binding *effect* as in a case affecting any other parties.

But if it be said that the provision of the Constitution that the law of the Union " shall be the supreme law of the land; and

the Judges in every State shall be bound thereby," is incompatible with the appellate control of the federal judiciary over the State tribunals, we answer that such a conclusion does not follow. It is true, that by this provision the "Judges in every State may construe the Constitution and the laws of the Union;" but, it does not follow that, to do this, they must construe them in the *last* resort, but only that, when they have questions before them involving these laws, they must construe them in the *first* instance. The declaration that the Judges "shall be bound thereby," is consistent with either theory. If we concede the theory to be true, that the framers of the Constitution intended this law of the land to be supreme *when* and *as* construed by the federal judiciary, "the Judges in every State" would still be "bound thereby." And when it is said that this provision was not necessary, if the appellate power over the State tribunals was given by other provisions of the Constitution, it may be said, in reply, that it is quite doubtful whether there is a single provision in this part of the sixth article that is not the necessary and logical result of other provisions of the instrument. It would seem to be clear, that if this whole provision relating to the supremacy of the laws of the United States had been omitted, the same result would still have followed. There are several provisions of the Constitution that were evidently put in for greater certainty. The clause which gives Congress the power "to make all laws which shall be necessary and proper for carrying into effect" the powers expressly granted, is of this character. And this would seem to be true of some of the amended articles, as, for example, amended article ten, namely: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

This provision, that where the power is not delegated nor prohibited, it is reserved, only renders that more certain, which, without it, would necessarily result from other provisions of the instrument. It would seem to be clear that the States being sovereignties already in existence, and not intending to delegate all their powers, would necessarily reserve all those *not delegated,* except those which, though not delegated, were *prohibited.* There are powers not delegated to the federal government, and yet prohibited to the States.

But if we judge this question by authority, the overwhelming weight of it will be found to sustain the position we have endeavored to maintain.

Mr. Madison, in the thirty-ninth number of the Federalist, uses this clear language:

"In this relation, then, the proposed government can not be deemed a *national* one, since its jurisdiction extends to certain enumerated objects only, and leaves to the several States a resi-

duary and inviolable sovereignty over all other objects. It is true, that in controversies relating to the boundary between the two jurisdictions, the tribunal which is ultimately to decide is to be established under the general government. But this does not change the principle of the case. The decision is to be impartially made, according to the rules of the Constitution; and all the usual and most effectual precautions are taken to secure this impartiality. Some such tribunal is clearly essential to prevent an appeal to the sword, and a dissolution of the compact; and that it ought to be established under the general, rather than under the local governments—or to speak more properly, that it could be safely established under the first alone, is a position not likely to be combated."

In the Virginia debates Mr. Madison also said:

"It may be a misfortune that, in organizing any government, the explication of its authority should be left to any of its co-ordinate branches. There is no example in any country where it is otherwise. There is no new policy in submitting it to the judiciary of the United States." (2 Elliot's Debates, 390; 1 Story on the Con., 267, note 2.)

The same position was sustained by Alexander Hamilton.

"The Constitution," says he, "in direct terms, gives an appellate jurisdiction to the Supreme Court, in all the enumerated cases of federal cognizance, in which it is not to have an original one, without a single expression to confine its operation to the inferior Federal Courts. The objects of appeal, not the tribunals from which it is to be made, are alone contemplated." (Federalist, No. 82.)

The Federalist has always been regarded as very high authority, not only because mainly composed of the writings of Madison and Hamilton, who were both members of the Convention, but especially because these essays were regular and elaborate commentaries on the proposed Constitution, and were published while the Constitution was before the nation for ratification or rejection; and must have been read and well understood by all the distinguished men who participated in the discussions of that day. These papers were expressly written in answer to objections founded upon the extent of the powers conferred upon the new government, and the diminution of State sovereignty. And when we reflect that this right of the national judiciary to determine in the last resort is frankly avowed and defended in these essays, written by such distinguished members of the convention, and so widely circulated, at the time, the conclusion seems irresistible that no other construction could have been intended by those who framed, or those who ratified the Constitution.

"A contemporaneous exposition of the Constitution," says Chief Justice Marshall, (6 Whea., 420,) "certainly of not less

authority than that which has been just cited, is the Judiciary Act itself. We know that in the Congress which passed that act were many eminent members of the convention which framed the Constitution. Not a single individual, so far as is known, supposed that part of the act which gives the Supreme Court appellate jurisdiction over the judgments of the State Courts, in the cases therein specified, to be unauthorized by the Constitution."

This point was brought before the Supreme Court of the United States, in the case of Martin *v.* Hunter's Lessee, 1 Wheaton, 304, and the appellate power of the Supreme Court over the judgments of State tribunals fully sustained. It was again brought before that Court in the case of Cohens *v.* The State of Virginia, (6 Whea., 264,) and again received the most elaborate consideration, and the appellate power of the Supreme Court was again affirmed.

The opinion of Chief Justice Marshall, in the latter case, is distinguished for its clearness and force. In alluding to the three positions assumed by the counsel of the State, he remarks:

" They maintain that the nation does not possess a department capable of restraining peaceably, and by authority of law, any attempts which may be made by a part against the legitimate powers of the whole; and that the government is reduced to the alternative of submitting to such attempts, or of resisting them by force. They maintain that the Constitution of the United States has provided no tribunal for the final construction of itself, or of the laws or treaties of the nation; but that this power may be exercised in the last resort by the Courts of every State in the Union. That the Constitution, laws, and treaties, may receive as many constructions as there are States; and that this is not a mischief, or if a mischief, is irremediable."

And in reference to the nature of our system, he says:

" America has chosen to be in many respects, and to many purposes, a nation; and for all these purposes her government is complete; to all these objects it is competent. The people have declared that in the exercise of all powers given for these objects it is supreme. It can, then, in effecting these objects, legitimately control all individuals or governments within the American territory. The Constitution and laws of the States, so far as they are repugnant to the Constitution and laws of the United States, are absolutely void. These States are constituent parts of the United States. They are members of one great empire—for some purposes sovereign, for some purposes subordinate."

In another portion of the opinion, the Chief Justice says, in reference to the weight of authority in support of the appellate

power of the Supreme Court of the United States over the State tribunals:

"While on this part of the argument it may be also material to observe that the uniform decisions of this Court, on the point now under consideration, have been assented to, with a single exception, by the Courts of every State in the Union, whose judgments have been revised."

"This concurrence of statesmen, of legislators, and of judges, in the same construction of the Constitution, may justly inspire some confidence in that construction."

Mr. Justice Story, in his thorough and able opinion delivered by him in the case of Martin v. Hunter's Lessee, referring to the same weight of authority says: "It is a historical fact, that the exposition of the Constitution, extending its appellate power to State Courts, was, previous to its adoption, uniformly and publicly avowed by its friends, and admitted by its enemies, as the basis of their respective reasonings, both in and out of the State Conventions. It is a historical fact, that at the time when the Judiciary Act was submitted to the deliberations of the first Congress, composed, as it was, not only of men of great learning and ability, but of men who had acted a principal part in framing, supporting, or opposing that Constitution, the same exposition was explicitly declared and admitted by the friends and by the opponents of that system. It is a historical fact, that the Supreme Court of the United States have, from time to time, sustained this appellate jurisdiction in a great variety of cases, brought from the tribunals of many of the most important States in the Union, and that no State tribunal has ever breathed a judicial doubt on the subject, or declined to obey the mandate of the Supreme Court, until the present occasion. This weight of contemporaneous exposition by all parties, the acquiescence of enlightened State Courts, and these judicial decisions of the Supreme Court, through so long a period, do, as we think, place the doctrine upon a foundation of authority which can not be shaken, without delivering over the subject to perpetual and irremediable doubts." (1 Wheaton, 351.)

The doctrine settled by these and other decisions of the highest tribunal known to the Constitution, was never denied by any State Supreme Court except that of Virginia, until the decision of this Court in the case of Johnson v. Gordon. Since the decision in that case, the Supreme Court of the State of Ohio, (23 Ohio R., 26,) in a late opinion, has taken the same ground.

But it would seem that no argument could more fully show the theoretical and practical error of such a principle, than the confusion that must be the legitimate result of these decisions.

The framers of the Constitution of the United States must have had some adequate motive for extending the jurisdiction of the national judiciary to cases in which an alien is a party; and

whatever reason can be supposed to have induced that provision, it must, in the nature of the case, apply as well to an alien defendant, as to an alien plaintiff. If it be a personal privilege, it must be as important to the one as the other.

This provision was no doubt intended to secure the rights of aliens against local State interests and prejudices. It is well known that before the adoption of the present Constitution, debts due to British subjects before the revolution could not be recovered in the State Courts, although protected by the treaty recognizing our independence. (2 Story on the Con., 469, note 1.)

In reference to this jurisdiction, Alexander Hamilton remarks, in the eightieth number of the Federalist: "The peace of the *whole* ought not to be left at the disposal of a *part*. The Union will undoubtedly be answerable to foreign powers for the conduct of its members. And the responsibility for an injury ought ever to be accompanied with the faculty of preventing it. As the denial or perversion of justice by the sentences of Courts is, with reason, classed among the first causes of war, it will follow that the federal judiciary ought to have cognizance of all causes in which the citizens of other countries are concerned. This is not less essential to the preservation of the public faith, than to the necessity of public tranquility."

As the privilege of the alien, of suing or being sued, is a personal privilege, he may readily waive it; but when he does assert it, whether he is a plaintiff or defendant, it should be accorded to him. Had Gordon been the plaintiff in that case, we presume his right to sue in the Federal Courts would not have been questioned. It is not perceived why he had not the same privilege of being sued in the same tribunal. His being plaintiff or defendant could not change his personal privilege nor defeat the national ends contemplated by the Constitution. The result was, that as Gordon was a defendant, sued within this State, his privilege was useless. Had he been sued within another State, his privilege would have been secured to him.

We have thus endeavored to state a portion of the reasons that compel us, under our constitutional oath, and our solemn duty to the Union, as well as to this State, to dissent from the doctrine laid down in the former decisions of this Court. With the utmost deference to the opinions of the distinguished members of the Court by whom these decisions were made, we must think them erroneous in principle, and practically destructive of the ends contemplated by our great national charter. It is a painful and delicate duty, and did we rely solely upon our own deductions, we should not have the same confidence in the correctness of our decision as we now do, when we are not only sustained by the highest efforts of our own reason, but by a weight of authority that would seem to be irresistible and conclusive.

It remains but to inquire whether, under the Judiciary Act of

1789, the defendant could be sued in a State Court. That act gives the District Courts of the United States "exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction." * * "Saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it."

It will be seen that only "a common law *remedy* is reserved to the suitor in the State Court." Is the *remedy* sought in this case a common law remedy? We think most clearly not. (Conklin's Tra., 152, 154; 1 Kent, 417, 380.)

If we hold that the common law remedy left to suitors under the saving clause in the ninth section of the Judiciary Act, *includes* proceedings *in rem*, as well as proceedings *in personam*, then the exception mentioned in the act is fully as broad as the general rule, and entirely destroys it. The District Courts could not then have *exclusive* jurisdiction in all civil admiralty cases.

In the case of New Jersey Steam Navigation Co. v. Merchants' Bank, 6 How. U. S. R., 344, the rule laid down, as deduced from previous cases, for determining the question of jurisdiction, "was the nature and subject-matter of the contract; whether it was a maritime contract, and the service a maritime service, to be performed upon the sea, or upon waters within the ebb and flow of the tide." (P. 392.)

In that case, Mr. Justice Nelson, in delivering the opinion of the Court, speaking of the construction of that part of the ninth section of the Judiciary Act, conferring *exclusive* original cognizance of all admiralty and maritime civil causes, but reserving to suitors the common law remedy, says:

"The Common Law Courts exercise a concurrent jurisdiction whether of tort or contract (with the exception of proceedings *in rem*,) which, upon the construction contended for, would be transferred from the admiralty to the exclusive cognizance of these Courts.

The meaning of the clause we think apparent. By the Constitution, the entire admiralty power of the country is lodged in the federal judiciary, and Congress intended, by the ninth section, to invest the District Courts with the power, as Courts of original jurisdiction.

The term "exclusive original cognizance" is used for this purpose, and is intended to be exclusive of the State, as well as the other Federal Courts.

The saving clause was inserted, probably, from abundant caution, lest the exclusive terms in which the power is conferred on the District Courts might be deemed to have taken away the concurrent remedy which had before existed.

This leaves the concurrent power where it stood at common law.

"The exclusive jurisdiction in admiralty cases was conferred

Warner *v.* Uncle Sam.

on the national government, as closely connected with the grant of the commercial power." (Pp. 390, 392.)

It would then seem clear not only from the definite language of the ninth section of the Judiciary Act, but from the language of the Supreme Court just quoted, that *exclusive original* jurisdiction in such cases was intended to be conferred by the act upon the District Courts. It is equally clear that this section of the Judiciary Act is in conflict with the act of the Legislature of this State conferring admiralty jurisdiction upon the Courts of this State. We must, therefore, of necessity, decide between them.

We have found no decision made by the Supreme Court of the United States upon the precise point involved; that is, had Congress the constitutional power to make the *original* jurisdiction in *civil* admiralty cases *exclusive* in the District Courts? This being true, we are left to construe this clause according to our own judgment.

The rules of construction laid down by Mr. Hamilton and quoted in the opinion in the case of Johnson *v.* Gordon, are conceded to be correct. The jurisdiction in admiralty cases is not given to the federal judiciary in exclusive terms, nor prohibited to the States; and to render the grant exclusive, the exercise of the power by the State tribunals must "be absolutely and totally contradictory and repugnant."

If we deny the right of appeal from the State Courts to the Supreme Court of the United States, then the exercise of admiralty powers by the State Courts would "be absolutely and totally contradictory and repugnant" to the exercise of the same power by the federal tribunals. The very end and purpose of conferring this power upon the national government would seem to be practically defeated, where the supervisory power of the same Supreme Court is denied. The uniformity intended could never be attained. If the State Courts have concurrent jurisdiction in all civil admiralty cases, and the right of appeal does not exist, then the plaintiff could select his Court of *last* resort. while the defendant could not. There being no uniformity of decision under this theory, it would give the plaintiff an advantage which he should not possess.

It is true, that this power of choosing his Court of last resort, is unquestionably given to the plaintiff in certain cases; as, for example, where the jurisdiction of the Federal Courts depends upon the character of the parties, and not upon the nature of the questions involved. But in these cases, as the subject-matter of the suit arises under a State law, the Federal Courts are bound to follow the rule of decision laid down by the Court of last resort in the State under whose law the case arose. So that, practically, the Supreme Court of the State determines the law of the case, whether the suit be brought in the Federal or State Courts.

It is only upon the distinct ground that the appellate power of the Supreme Court of the United States extends to the State Courts in proper cases, that the concurrent *original* jurisdiction of the State and Federal tribunals over *civil* admiralty cases, can be sustained. Conceding this appellate power to exist, then there is nothing in the language of the Constitution, or in the nature of the jurisdiction itself, to make it exclusive. The exercise of this original jurisdiction by the State Courts, subject to. the supervisory power of the Supreme Court of the United States, would seem to be compatible with the harmony and efficiency of the system, and beneficial in its practical effects.

Chancellor Kent, and Mr. Rawle, (1 Com., 412; Rawle on Con., 202,) considered the admiralty jurisdiction of the District Courts as exclusive in all cases; but Mr. Justice Story doubts the correctness of this view. (2 Story on the Con., § 1673, note.) He considers the jurisdiction as not depending upon the pleasure of Congress, but upon the "reasonable interpretation of the Constitution." In another section, (1754,) Mr. Justice Story says :

"It seems to be admitted, that the jurisdiction of the Courts of the United States is, or at least may be made exclusive, in all cases (*in their character exclusive*) of admiralty and maritime jurisdiction."

The suit in this case is upon a maritime contract, and we conceive the jurisdiction as not "in its character *exclusive*," and that, therefore, the District Court had jurisdiction of the subject-matter of the suit, and the demurrer should have been overruled. There are several other causes of demurrer assigned, but we think they are not well taken.

I think the judgment should be reversed, and the caused remanded for further proceedings.

TERRY, C. J.—Counsel contends that defendant can not be held responsible in this form of action, because it appears that only a part of the distance, or voyage, was to have been made on the defendant, and that defendant can not be held responsible for the failure of the entire contract.

The complaint charges a breach of the contract, by the failure of defendant to perform the voyage to the port of San Juan, in Nicaragua, and we think this is a sufficient breach of the contract to support the action; for aught that appears, the detention was wholly caused by the failure of defendant to land the plaintiff at San Juan.

The objection to the joining the wife as plaintiff is not tenable. The action, though based on a contract, sounds *in tort*. The gist of it is the personal injury to the wife, by reason of forcing her to land at Panama, and remain exposed to the unwholesome climate for a period of two weeks.

"The husband and wife *must* join if the action be brought for

the personal suffering or injury to the wife, and in such a case the declaration ought to conclude to their damage, and not to that of the husband alone, for the damages will survive to the wife, if the husband die before they are recovered." (1 Chitty on Plea., 73, and authorities cited.)

A cause of action in which the husband alone was interested, to wit: the loss and expenses occasioned by the breach of the contract, was improperly joined in the complaint, but as no exception was taken by the demurrer to the misjoinder of causes of action, the objection must be deemed waived.

The counsel for respondent seems to rely mainly on his objection to the admiralty jurisdiction of the State Court, and his argument is chiefly devoted to an examination of decisions heretofore made by this Court in favor of such jurisdiction.

Indeed, so great is his zeal for the demolition of certain doctrine promulgated by this Court, that he has gone beyond the questions raised by the record to attack its decision in Johnson *v.* Gordon, upon a question which is not involved in or necessary to the decision of the case. As that decision received the unanimous approval of the learned Judges who, at the time of its rendition, constituted the Supreme Court of California, we do not feel warranted in entering into an examination of it, unless such a course is rendered absolutely necessary to the proper adjudication of the questions directly involved in the record before us.

In Johnson *v.* Gordon, this Court decided against the validity of the twelfth and twenty-fifth sections of the Judiciary Act of 1789, which provided for the removal to the Federal Courts of causes commenced in the State Courts, and for an appeal, in certain cases, from the highest State Court to the Supreme Court of the United States. These questions are, as I conceive, no way involved in the record under consideration; and, indeed, if the counsel should succeed in establishing the correctness of his proposition, as to the appellate jurisdiction of the Supreme Court of the United States, he furnishes the strongest argument in favor of the concurrent admiralty jurisdiction of the State Courts.

Commentators lay down three rules by which the exclusiveness of a grant of jurisdiction to the Federal Courts may be determined :

1. If the grant of jurisdiction is expressly made exclusive.

2. If the exercise of it be prohibited to the States.

3. If the exercise of the power or jurisdiction by the State Courts is incompatible with the harmonious working of the system established by the Federal Constitution.

Now, the grant of admiralty jurisdiction to the Federal Courts is not, in terms, exclusive. The exercise of it is not prohibited to the State Courts; and if the counsel be correct, and a writ of error will lie from the Supreme Court of the United States to

this tribunal, the exercise of concurrent jurisdiction in such cases, by the State Courts, is not incompatible with the harmonious working of the federal judiciary system.   Uniformity of decisions can as well be maintained by the supervision and control which the Supreme Court of the United States will exercise over the State Courts in such cases, by virtue of its appellate jurisdiction, as by confining the determination of causes of that nature exclusively to the Federal Courts.

The counsel contends that whatever weight or authority might have attached to the decision in Johnson v. Gordon, was removed by the act of the California Legislature, passed April, 1855, which provided for the removal of causes, and for appeals from the State to the Federal Courts, in certain cases.

If this act be regarded as a construction of the Constitution of the United States, by the Legislature of California, and such construction as authority binding on the Courts, the authority of the same tribunal may be cited against the claim of exclusive admirality jurisdiction, made in favor of Federal Courts.   The Civil Practice Act, section three hundred and seventeen, provides that "all steamers, vessels, and boats, shall be liable," amongst other things, "for non-performance, or mal-performance of any contract for the transportation of persons or property, made by their respective owners, masters, agents, or consignees."

That the provisions of this act were intended to apply to all vessels, as well those engaged in voyages to and from foreign ports, as those navigating the waters of the State, is conclusively shown by reference to the language of the act of 1850.   This act provided that all steamers, vessels, and boats, *navigating the waters of this State*, shall be liable, etc.   The Legislature of 1851, while incorporating the provisions of this law into the Civil Practice Act, omitted, . *ex industria*, the words limiting its application to vessels navigating the waters of the State.   If the act of the Legislature of 1855 be authority in favor of the validity of the twelfth and twenty-fifth sections of the Judiciary Act, sufficient to overthrow the opinion of this Court in the case of Johnson v. Gordon; the statute of 1851, which stands unrepealed, is equally authority to sustain the decision in Taylor v. The Columbia, which is against the constitutionality of the ninth section of the same act.   We apprehend, however, that the province of determining the validity of statutes belongs more properly to the judicial than the legislative department of our government.

This case differs from Johnson v. Gordon in another important respect.   The questions presented in Johnson v. Gordon had been distinctly raised, and, after full argument, decided by the highest judicial tribunal in the republic, and these decisions having been acquiesced in, for a long series of years, the rule *stare*

*decisis* might well be invoked in favor of their finality.    But with all his zeal and research, the counsel has not been able to find a single case in which the question as to the exclusiveness of the jurisdiction of the Federal Courts in admiralty cases has been *directly* decided.    There are, it is true, numerous *dicta* of the Federal Judges asserting, or, more properly speaking, assuming, that their jurisdiction in such cases is exclusive, but those *dicta* occur in cases where the question was neither argued, nor its decision necessary to the complete adjudication of the points really at issue.

The first case cited is that of Slocum *v.* Maberry, (2 Wheaton, 1,) which was an action begun in the State Court of Rhode Island, to recover the cargo of a vessel which had been seized by Slocum, who was a custom-house officer, for an alleged infraction of the Embargo Act.    The exclusive admiralty jurisdiction of the Federal Courts was not questioned by the defendant in error. The judgment of the State Court was defended on the ground that the Embargo Act only authorized the seizure of the *vessel*, and did not affect the cargo; and this view was sustained by the Court.    The next is the case of Gelston *v.* Hoyte, (3 Wheaton, 346,) which was an action for damages for taking from the possession of plaintiff a ship, and other property.    The defendant justified by averring a seizure of the ship under an order from the President of the United States, for a violation of the neutrality law.

On the trial, the plaintiff produced a record of proceedings to enforce a forfeiture of the vessel before the United States District Court, by which it appeared that the vessel had been acquitted and ordered to be restored to plaintiff.

The defendant offered proof, tending to show that the plaintiff had violated the law in fitting out the vessel for the service of a foreign State, to be used against another State at peace with the United States.    The State Court rejected the evidence on the ground that the judgment of the United States Court, on the question of forfeiture, was conclusive.

The legality of this ruling was the only question raised by the bill of exceptions; it was the only one really decided by the Court, and on this point the judgment of the State Court was affirmed.

Mr. Justice Story, in his opinion delivered in the case, (to quote the language of Mr. Justice Johnson, who concurred in the *judgment*) "goes into the consideration of a variety of topics, which do not appear to be essential to the case."

In the case of the bark Chusan, 2 Story, 455, there was no question of jurisdiction either raised or decided.    The action was brought in the Federal Court, to enforce a lien for materials furnished a vessel in the port of New York, and the question decided was, that the United States Courts were governed in

the enforcement of such contracts by the general and not by the local law.

The case of Warring *v.* Clark, 5 Howard, 461, was an action growing out of a collision on the Mississippi river, about one hundred miles above New Orleans, but within the ebb and flow of the tide; and the question there was, not whether the admiralty jurisdiction of the United States Court was exclusive, but whether it extended to that case.

Thus it will be seen that there is no adjudicated case sustaining the constitutionality of the ninth section of the Judiciary Act, and the doctrine of *stare decisis* can not be invoked in behalf of the position of respondent, and against the reasoning and opinions of this Court.

The loose expressions of the Federal Judges occurring in opinions involving other and very different issues, can not be regarded authority upon the question of jurisdiction.

There is often contained in the published decision of the Courts two different kinds of opinions, *judicial* and *extra-judicial.*

A judicial opinion is one that is on the question before the Court: it is the direct, solemn, and deliberate decision of the *Court* upon the issues raised by the record and presented in the argument. Such an opinion is absolutely binding on all subordinate tribunals, and is received as authority in Courts of co-ordinate jurisdiction.

An extra-judicial opinion is an opinion given on a question that it was *not necessary* to decide in the case in which it was given. (4 Burr., 2068.) Or on a point which was not then the point in question. (1 Strange, 37.) Or, a proposition generally expressed, and which the case, or the circumstances of the case, did not call for. (5 Taunt., 153, 159.) Or, an opinion on a point which was not the point argued before the Court, or upon which the Court pronounced its judgment. (3 B. & A., 122.) Or, an opinion not called for by the case, and which it was unnecessary to give. (2 Young & I., 379.)

The practice of introducing *obiter dicta* into the opinions of Judges has been often deprecated, " because having a tendency to uphold a doctrine, or point, which, perhaps, on examination can not be sustained, while the support which it derives from the *dicta* is sufficiently powerful to invite litigation." (1 Blackstone, 53.)

In delivering the opinion of the Court, in Pendack *v.* McKinder, Wills, J., says : " I shall confine myself to the question before us, because I have observed great mischiefs arise from Judges giving *obiter* opinions." (Wills, 666.) In The King *v.* The College of Physicians, (7 T. R., 287,) Lord Kenyon said : " I can not but lament that learned Judges, in deciding the cases reported in Burrow, did not confine themselves to the points

immediately before them, but have dropped hints that perhaps have invited litigation."

Such opinions are regarded as the mere gratuitous expressions of the Judge pronouncing the judgment, and not as the deliberate ruling or opinion of *the Court;* and though the well established reputation, for learning and ability, of the Judge in whose opinion they occur may, in some cases, entitle them to respectful consideration, they have never been regarded as authority.

In Chase *v.* Westman, Lord Ellenborough remarks of a *dictum* of Lord Holt, in Collins *v.* Ougby : "But the point was not in judgment before my Lord Holt, and therefore the opinion then delivered by him, although entitled to great respect, has not the weight that would belong to a judicial decision of that very learned Judge." (5 Maule & Sel., 185.)

In reference to a *dictum* of Lord DeGray, in Farmer *v.* Arundel, Mr. Justice Gibbs said : "Now the case did not call for this proposition, so generally expressed, and I do think that doctrine laid down so very widely and generally, when it is not called for by the circumstances of the case, is but little to be attended to." (Brisbane *v.* Dacre, 5 Taunt., 153.)

Chief Justice Vaughn remarks of such opinions : "An extra-judicial decision, given in or out of Court, is no more than the *prolatum* or saying of him who gives it ; nor can it be taken for his opinion, unless everything spoken at pleasure must pass as the speaker's opinion. An opinion given in Court, if not necessary to the judgment given of record, but that it might have been as well given if no such or a contrary opinion had been broached, is no judicial opinion, but a mere *gratis dictum.* But an opinion, though erroneous, concluding to the judgment, is a judicial opinion, because delivered under the sanction of the Judge's oath, upon deliberation, which assures us it is, or was when delivered, the opinion of the deliverer." (Vaughn, 382.)

It is said that the claim to exclusive admiralty jurisdiction by the Federal Courts, has been acquiesced in by the various State Courts for a period of sixty years, and was for the first time brought in question in the case of Taylor *v.* The Columbia.

It is true that such jurisdiction has been for a very long time exclusively exercised by the Federal Courts ; the selection of a forum for the trial of causes, is the act of the party instituting proceedings ; the jurisdiction of the Federal Courts in a certain class of action was never questioned, while the language of the Judiciary Act threw a doubt upon the concurrent jurisdiction of the State Courts. Where both tribunals were equally accessible, parties and counsel preferred to commence actions in the Federal Courts rather than be compelled to be at the cost and labor of procuring a decision on the constitutionality of an act of Congress.

This fact, however, furnishes no evidence of acquiescence on

the part of the State Courts.   Court were organized for the trial not of questions, but of cases; and questions of vital interest to the whole people may rest in doubt and uncertainty for years, unless they are presented to the Court by the record of a case before it, and their decision becomes necessary to the determination of the rights of the parties litigant.

As the power of a Court to determine questions depends upon the action of parties litigant, their acquiescence in a doctrine can be shown only by a direct recognition of its legality.

The several States of the Union are sovereign, and endowed with all the attributes and right of independent States, except such as by the Constitution have been surrendered to the United States, or prohibited to the individual States.   Amongst the attributes of sovereignty, is the power and jurisdiction to determine fully all controversies affecting the rights of her citizens.

This power has not, as we have endeavored to show, been surrendered, either expressly or by necessary implication, but remains in full vigor in the State government.

Jurisdiction in certain causes was given by the Federal Constitution to the United States Courts; but this grant contains no words of exclusion, nor any evidence of an intention to take from the tribunals of the several States the powers which were vested in them.

On this point we think the argument of Judge Bronson, in Delafield v. The State of Illinois, conclusive : " There is nothing in the nature of jurisdiction, as applied to Courts, which renders it exclusive.   It is not a grant of property, which can not have several owners at the same time.   It is matter of common experience that two or more Courts may have concurrent powers over the same parties and the same subject-matter.   Jurisdiction is not a right or privilege belonging to the Judge, but an authority or power to do justice in a given case when it is brought before him.   There is, I think, no instance in the whole history of the law, where the mere grant of jurisdiction to a particular Court, without any words of exclusion, has been held to oust any other Court of the powers which it before possessed.   Creating a new forum, with concurrent jurisdiction, may have the effect of withdrawing from the Courts which before existed a portion of the causes which would otherwise have been brought before them; but it can not affect the power of the old Courts to administer justice, when it is demanded at their hands."

This question has heretofore been decided by this Court in Taylor v. The Columbia, and we entertain no doubt of the entire correctness of that decision.

Judgment reversed, and cause remanded for further proceedings.

FIELD, J.—The objections raised by the demurrer go to the parties plaintiff, and to the jurisdiction of the Court.

As to the first objection, I can not concur with my associates. The action is confessedly based upon the provision of the statute which renders steamers liable for the non-performance of any *contract* for the transportation of persons or property, made by their owners, masters, agents, or consignees. The contract is the substantive cause of action, and the injuries received are alleged by way of special damage. The wife was, therefore, improperly joined as a party plaintiff, and the demurrer for the misjoinder is, in my judgment, well taken.

By the second objection, the constitutionality of the act of the Legislature is drawn in question. It is contended that the act confers upon the State Courts a jurisdiction in conflict with the admiralty and maritime jurisdiction of the Federal Courts, and and that the latter is exclusive. On this point, I concur in the views of the Chief Justice; and until the question of exclusive jurisdiction in the Federal Courts is directly passed upon by the Supreme Court of the United States, and the jurisdiction to the exclusion of all cognizance by the State Courts is affirmed, I think we should hesitate to declare the act of the Legislature unconstitutional, and reverse the former deliberate judgment of this Court.

BURNETT, J., on petition for a re-hearing:

The learned counsel for the defendant, in his petition for a re-hearing, has suggested some difficulties, which it is proper to notice. It is insisted, that the whole course of reasoning of my former opinion tends to the conclusion that the original jurisdiction of the District Courts of the United States, in civil admiralty cases, is exclusive.

It may be true, and, for the sake of the argument only, we will concede the fact, that, under the Constitution of the United States, and the Judiciary Act of 1789, an appeal from this Court to the Supreme Court of the United States, will only involve the *question of jurisdiction*, and not the merits of the decision under the Admiralty Code. But this in no way impairs the reasons given, or the grounds upon which the opinion was based.

When the Constitution extended the judicial power of the United States " to all cases of admiralty and maritime jurisdiction," it made the Maritime Code the law of the nation. As such, it is not in the power of a State to change it. If changed, it must be done by the National Legislature. The provision, that the judicial power shall extend to all such cases, is fully satisfied when the *appellate* power is extended to them. (Kent, pp. 318, 320.)

In the case of Wiscart *v.* Dauchey, (3 Dallas, 321,) it was held that only appellate jurisdiction is given to the Supreme Court in those cases where the jurisdiction depends upon the nature of

the subject-matter; and " even this appellate jurisdiction is likewise qualified; inasmuch as it is given, with such exceptions and under such regulations as Congress shall make." " Here, then," continues the Chief Justice, " is the ground, and the only ground on which we can sustain an appeal. If Congress has provided no rule to regulate our proceedings, we can not exercise an appellate jurisdiction; and, if the rule is provided, we can not depart from it." This view was confirmed by the subsequent cases of Clark v. Bazadoni, (1 Cranch, 77,) The United States v. More, (3 Cranch, 159,) and Duroussian v. The United States, (6 Cranch, 307.).

The *failure* of Congress to provide for an appeal from the State tribunals, in civil admiralty cases, can not affect the question as to their concurrent original jurisdiction, under the Constitution of the United States. If this concurrent original jurisdiction exists, then the right of appeal depends upon the pleasure of Congress.

As to another point, involving a question of practice, it is proper to give the reasons which induced me to concur in deciding the point against the defendant.

I concur with my Brother Field, that " the contract was the substantive cause of action, and the injuries received were alleged by way of special damage." But I do not concur with him in the conclusion he draws.

It is true, that the husband and wife were nominally joined as plaintiffs; but the cause of action, as distinctly set forth in the complaint, was a contract *only* between Warner and the owners of defendant. The name of Mrs. Warner was, therefore, mere surplusage, and not a defect of parties under the fortieth section of the Code, and might have been stricken out on motion, if desired. (1 Ch. Plead., 14, note 10; Code, § 69.) Had final judgment been rendered for plaintiffs, it would have been a good bar to a subsequent suit by Warner alone, upon the *same* cause of action. All the parties to be affected by the decision were before the Court. Where A and B sue upon a *joint* cause of action, they must *prove* the joint cause, as alleged. When one plaintiff only sues, and alleges a joint cause of action, the defendant may demur, for the reason that one of the parties interested in the subject of the suit is not before the Court, and may not be bound by the decision. There are the best reasons why a defendant may demur for a defect of parties, plaintiff or defendant. This right to demur was given, to enable the defendant to have all the parties before the Court, as provided in section seventeenth of the Code.