[S. F. No. 3828.  In Bank.—October 3, 1907.]

# CHRISTOPHER H. KIRK, Respondent, v. J. S. KIMBALL COMPANY, Appellant.

COMMON CARRIER—DAMAGES FOR FAILURE TO TRANSPORT TO DESTINA-
TION—ACTION IN TORT.—An action to recover a sum of money
as damages alleged to have been sustained by the plaintiff through
the failure of the defendant, a common carrier of passengers, to
transport him from San Francisco to the city of Dawson, Alaska,
although based on a contract, is one of tort.

ID.—CONTRACT TO TRANSPORT OVER CONNECTING LINES.—A common car-
rier may so issue tickets beyond its own lines and so control the
transportation of its passengers as to be held to have contracted
for the entire distance, and in consequence be answerable in dam-
ages for any breach of its obligations occurring on any one of
the connecting lines.

ID.—DEFAULT OF CONNECTING LINES—LIABILITY OF CARRIER FOR.—Where
there are several connecting lines and the plaintiff passenger seeks
to recover for an injury resulting from the act of a connecting
company, he must show a contract whereby the defendant carrier
agrees to transport or warrants his transportation over the connect-
ing lines, or show that it had such control over or controlling interest
in the connecting company as to vest the defendant company with
power to secure transportation over the connecting line and to make
it its duty to see that such transportation is effectuated.  The evi-
dence in this case reviewed and held not to show such a contract
for carriage, or such an interest or control by the defendant as to
render it liable for the default of a connecting line.

APPEAL from a judgment of the Superior Court of the
City and County of San Francisco and from an order refus-
ing a new trial.  Frank J. Murasky, Judge.

The facts are stated in the opinion of the court.

Page, McCutchen & Knight, and C. E. Wilson, for
Appellant.

Sullivan & Sullivan, and Theodore J. Roche, for Re-
spondent.

HENSHAW, J.—This action was instituted by plaintiff to
recover the sum of ten thousand dollars for damages alleged
to have been sustained by him through the failure of the de-

fendant, a common carrier of passengers, to transport him
from San Francisco to the city of Dawson, Alaska. The case
was tried before a jury, which rendered a verdict in favor of
the plaintiff for the sum of six thousand dollars. Upon
motion for a new trial the amount of the verdict was reduced
by the court to two thousand seven hundred and thirty dol-
lars, which reduction was accepted by the plaintiff and a new
trial denied. Judgment was entered in favor of the plaintiff
accordingly, and defendant appeals.

The facts necessary to an understanding of the legal
propositions presented are the following: In 1898 there was
a corporation organized for the purpose of carrying freight
and passengers between San Francisco and St. Michael,
Alaska, which corporation may, for convenience, be desig-
nated the "California Corporation." There was likewise a
corporation engaged in the business of a common carrier of
freight and passengers on the Yukon River between St.
Michael and Dawson City, which for convenience may be
called the "Yukon Company." An agreement was entered
into between these two corporations by virtue of which the
California company agreed to transport passengers and
freight from San Francisco to St. Michael, from which place
the Yukon company was to carry them to Dawson City. The
California corporation, having no sea-going steamer of its
own, chartered from the defendant J. S. Kimball Company
the steamer "Dirigo," by which the passengers were to be
carried to St. Michael. The Yukon company was having
built for it in San Francisco a river boat, called the "City
of Dawson," which boat was to be towed to St. Michael by
the steamer "Dirigo." After reaching this place it was to
take on board the passengers and freight·for Dawson City
and proceed on the river journey. Tickets were sold by the
California corporation on behalf of itself and the Yukon cor-
poration for passage from San Francisco to Dawson City.
These tickets contained two coupons, and provided that the
passage from San Francisco to St. Michael should be made
over the line of the California company, while the passage
from St. Michael to Dawson City should be made over the
line of the Yukon company. These tickets, which evidenced
the contract between those companies and the purchasers,
contained, amongst others, the following provisions: "In

selling tickets, coupons or orders over other lines in connecting with this ticket and checking baggage thereon, this company acts as agent and shall not be responsible beyond its own line. . . .

"Neither shall said vessel, her owners or charterers be under any obligation to forward passengers to their destination by any other conveyance or line nor refund the amount of passage. . . .

"No agent or employee has any power to modify or waive in any manner any of the conditions named in the contract."

The California company experienced financial difficulties, was unable, in short, to pay the charter money for the "Dirigo," and dropped out of business, the J. S. Kimball Company, owner of the "Dirigo," assenting to a substitution of itself in place of the California company. By this arrangement the Kimball Company was to tow the "City of Dawson," belonging to the Yukon company, for an agreed price, and was to receive, under their traffic agreement, forty-five per cent of freight and passage money for carrying them to St. Michael, while the Yukon company was to receive fifty-five per cent for its part, which was the river transportation. This agreement was in writing, and subsequently, according to the testimony of Zadig, manager of the Yukon company, was modified by parol agreement, according to which, he testifies, the two companies became "jointly" interested in the transportation of freight and passengers. The idea here sought to be conveyed, and which the respondent insists was conveyed with legal sufficiency, is that the Kimball Company thus entered into a partnership with the Yukon company, obtained a control over the Yukon company's means of transportation and conduct of business, and became directly responsible to the passengers, not merely for their transportation to St. Michael—the end of the Kimball Company's run—but also for the river run to Dawson City as well. When analyzed, however, Zadig's testimony does not show that the "joint" interest of the two companies was any different from what it always had been, saying that the Kimball Company was to receive fifty per cent of the passenger and freight rate instead of forty-five per cent as before agreed upon. The tickets issued to the passengers, it is to be noted, were iden-

tical with those first issued, with the substitution of the name
of the Kimball Company for the California company, and
the plaintiff testifies that at the time this second ticket was
issued to him, Mr. Lauden (appellant's manager) said "they
would assume or were assuming the contracts just as we
had made them with the transportation companies." The
Yukon company in turn became financially involved and was
unable to proceed with its part of the contract. Its steamer,
"City of Dawson," was libeled and the company was with-
out financial ability to release the attachment. Delays in
prosecuting the voyage followed, much feeling was aroused
among the passengers because of this delay, and, in the end,
against the protest of Zadig, manager of the Yukon com-
pany, an arrangement was effected by the Kimball Company,
or by the passengers of the "Dirigo," or by both, with still
another company, the Alaska-Yukon Company. The Alaska-
Yukon Company had a river steamer, known as "James
Eva." This agreement, as testified to by Mr. Lauden, man-
ager of the Kimball Company, was in effect a substitution
of the Alaska-Yukon Company for the incapable Yukon
company of Zadig. The Alaska-Yukon Company agreed to
transport the "Dirigo" passengers and freight from St.
Michael to Dawson City upon the first of their boats to arrive
after the arrival of the "Dirigo." It was expected that this
transportation would be made by the "James Eva," one of
the river boats, which was then on its way from San Fran-
cisco to St. Michael. But in the not unlikely event that
the "James Eva" was lost at sea (which actually oc-
curred) or had departed from Dawson City before the
arrival of the "Dirigo," the Alaska-Yukon Company would
receive the passengers and freight on another steamer called
the "Rufus E. Wood," and in the event that the "Rufus
E. Wood" was not available, the Kimball Company was to
deliver the freight and passengers upon the beach, when the
Alaska-Yukon Company would become responsible for their
further transportation. In brief, as has been said, the Alaska-
Yukon Company took over the rights and duties of trans-
portation from St. Michael which formerly had belonged to
the Yukon company. The contract was, of course, entered
into between the two transportation companies. There is no
doubt as to the nature of that contract. It was as above

set forth. There is no doubt also that it was entered into by
the Kimball Company because of the clamorous desire of the
passengers on the "Dirigo" to proceed with their journey,
on the one hand, and the reluctance of the Kimball Com-
pany, on the other, to forfeit its share of the business of
this transportation because of the failure of the Yukon com-
pany. Under this arrangement the "Dirigo" proceeded on
its voyage and arrived safely at St. Michael. There the
Alaska-Yukon Company made default. The "James Eva"
had been lost at sea. No other steamer was provided for the
river voyage. The passengers made demand that the Kim-
ball Company transport them or secure transportation for
them. The Kimball Company refused to do this, but offered
to repay the one half fare forfeited by the Alaska-Yukon
Company. Plaintiff refused to accept this and was brought
back to San Francisco, where, in time, this action was
commenced.

The complaint in this action, though based on a contract,
sounded in tort (*Jones* v. *S. S.* "*Cortes,*" 17 Cal. 487, [79
Am. Dec. 142]; *Warner* v. *S. S.* "*Uncle Sam,*" 9 Cal. 697;
*Sloane* v. *Southern California Ry.* Co., 11. Cal. 668, [44 Pac.
320]), and the demurrer to it, was therefore properly
overruled.

As to the liability of a connecting carrier for transportation
beyond its own line or route, the law is so well settled that
there can be no controversy over the matter, and indeed there
is none here. The court instructed the jury that a "common
carrier may so issue tickets beyond its own lines and so
control the transportation of its passengers as to be held to
have contracted for the entire distance, and in consequence be
answerable in damages for any breach of its obligations
occurring on any one of the connecting lines. But where
there are several connecting lines and plaintiff seeks to re-
cover for an injury resulting from the act of a connecting
company, plaintiff must establish a contract with the com-
pany he seeks to hold, or prove that it had some interest in
or control over the transportation of passengers by the line
in default." This instruction correctly enough enunciates
the law, saving in two particulars. It should have been more
explicit as to the nature of the contract which plaintiff must
establish. The contract which plaintiff must show is a con-

tract whereby the defendant carrier agrees to transport or warants transportation over the connecting lines. Of course, it would not be sufficient for the plaintiff in such a case to show merely that he had a contract with the company that he sought to hold unless he further showed that the contract which he established bound the company to the performance of the particular obligation which was violated. Again, it is not sufficient, in order to hold a company, to prove that it had "some interest in or control over the transportation of passengers by the line in default." Some interest would be evidenced by the fact that the defendant company was a creditor of the other or owned some of its stock, and "some control" over the transportation of passengers is exercised by every transportation company over connecting lines. Thus, one connecting transportation company cannot convey passengers unless they are delivered to it by the other line, and always to the extent of the delivery the one line controls the transportation of the passengers of the other. Of course, what was meant is such control over or controlling interest in the connecting company as to vest the defendant company with power to secure transportation over the connecting line and to make it its duty to see that such transportation is effectuated.

But this, however, is merely in passing, for respondent makes full concession that the law is as above stated, but insists that the evidence, though in conflict, establishes such an interest and control by the Kimball Company in the Yukon company by the agreement heretofore commented on as made it its duty to see to and secure the transportation of the passengers from St. Michael to Dawson. Upon this turns the whole case, and we are of the opinion that to establish this proposition there is a signal failure of evidence. Indisputably the ticket issued by the Kimball Company to plaintiff and accepted by him established the contract between the parties. (Civ. Code, sec. 2176; *Boglan* v. *Hot Springs R. R. Co.*, 132 U. S. 146, [10 Sup. Ct. 50].) At the time of the issuance of this ticket the Kimball Company had merely been substituted for the California company, and its duty to the plaintiff was limited by the termination of its voyage to St. Michael. As before pointed out, plaintiff himself testifies that the Kimball Company informed him

that it was assuming the contracts just as they had been made with the California company. He testified further that when he received the ticket he knew exactly what arrangement had been made for his river transportation. Respondent not only admits but insists that the measure of the defendant's liability is fixed by the terms of the last contract made by Zadig for the Yukon company with the Kimball Company. The whole weight of respondent's argument is brought to bear upon the proposition that, under this oral agreement as testified to by Zadig, the Kimball Company became *"jointly"* interested with the Yukon company in the enterprise of carrying passengers and freight from San Francisco to Dawson, and therefore became liable to this plaintiff so to do. Great reliance is here placed on the testimony of Zadig, and italicized extracts are made therefrom. We will quote from Zadig's testimony the statements upon which respondent relies: "The verbal agreement we had with J. S. Kimball was *we were jointly going together;* he was going to take us to St. Michael, the 'Dawson City,' I mean, and whatever passenger and freight money was received between Dawson and San Francisco, *we were to divide jointly, and the returns from going up and coming down to San Francisco, both ways, were to be divided among ourselves, share and share alike.* The 'Dirigo' was substituted under the arrangement that we should go in jointly. We entered into these arrangements after these original people, the Troy people (California company) had failed to perform their conditions contained in the charter party, and then *when Mr. Kimball saw that we could not carry that out, he made a new proposition to us to go in jointly, he take half and we half. The agreement was made with Kimball, fully two weeks or a little more before the 'Dirigo' sailed. We made an entirely new deal, if you want to call it that way, with Kimball, and it was considered the joint account, that he takes half and we take half,* which really was more advantage to him than to us, because it cost more from St. Michael to Dawson. He had the best of the bargain, if he would have had the boat gone up there, because the Dawson trip was the most expensive one. The facts are that we made a new arrangement. I must have found out that there was not enough money to go away, otherwise I needn't to make any

different arrangements. Why should I make an arrange-
ment, which is poorer than—make an arrangement not as
good—a new one not as good as the old one. There must
have been some reason for it. A man never switches from
a good thing to a bad thing unless there is some reason. The
arrangement must have been made because we could not
help ourselves. I understood that we were to divide equally
the passage and freight money, after the payment of the
towage and demurrage bill. We were to get fifty per cent
instead of fifty-five.'' When all of Zadig's testimony is read
it is made apparent beyond peradventure that the only dif-
ference between the written contract and the amended oral
contract was that the Kimball people were to receive fifty
per cent instead of forty-five, and the reason for this is fully
explained as arising because of the delays which the Yukon
people had occasioned in the sailing of the "Dirigo," and
because of the additional fact that they had not produced
for that vessel the number of passengers and the amount of
freight which they had promised. Such being the case, it
is manifest that there was no more of a *"joint"* enterprise in
a legal sense under the division of fifty and fifty per cent
than there was under the earlier agreement when the division
was forty-five and fifty-five per cent. It is as plainly ap-
parent that throughout his testimony, where Zadig uses the
word "jointly" he means "equally."

It follows, therefore, that, treating the ticket as the measure
of defendant's obligation, it bound itself to nothing more
than the transportation of plaintiff to St. Michael, which duty
it fully performed, under conditions all known to the plaintiff
at the time he accepted the ticket. If, however, reliance be
placed by respondent upon the proposition that defendant,
by contract with the Yukon company, obtained a control over
its lines and thus imposed upon itself a duty to its passengers
to see that they were transported to Dawson, then it must be
said that the evidence totally fails to establish such an agree-
ment and control. Without Zadig's testimony the case of
plaintiff in this respect fails utterly, and Zadig's testimony,
as has been shown, is entirely inadequate to support this
contention.

This conclusion renders unnecessary any consideration of
the other propositions advanced by appellant, and, for the

reasons given, the judgment and order appealed from are reversed.

McFarland, J., Angellotti, J., Lorigan, J., Sloss, J., and Shaw, J., concurred.